In the Matter of The New York Title and Mortgage Company.
(Series N-75.)

Supreme Court, Additional Special Term, New York County, April 27, 1938.

*Leon Leighton*, for the petitioner.

*Cullen & Dykman* [*Jackson A. Dykman* and *Jules Haberman* of counsel], for the Brooklyn Trust Company, as trustee.

*Louis S. Posner, Special Counsel for the State Mortgage Commission.*

FRANKENTHALER, J. This is an application to compel the Brooklyn Trust Company, as trustee for Series N-75 of the New York Title and Mortgage Company, to account for an item of $34,000, which had been turned over to the trustee by the Mortgage Commission of the State of New York on May 29, 1936.

The $34,000 was turned over by the Brooklyn Trust Company to the owner of the mortgaged premises on June 3, 1936, less than a week after its receipt. At that time the owner's arrears of taxes and interest totaled $177,388.28. The trustee seeks to justify its conduct in handing over the $34,000 to the owner of the property, despite these tremendous arrears, on the theory that the money belonged to the owner and did not constitute part of the trust estate. The trustee further contends that even if the $34,000 did in fact belong to the certificate holders, as part of the trust estate, and was erroneously paid over by it to the owner of the mortgaged premises, the trustee is nevertheless exonerated from liability under the provision of the declaration of trust that " the trustee shall not be liable for any error of judgment or for any loss arising out of any act or omission in the execution of this trust so long as he acts in good faith and without negligence." (Declaration of Trust, art. XIII, subd. d.)

The Brooklyn Trust Company was chosen as trustee by vote of the certificate holders themselves and was thereupon appointed trustee in accordance with the provisions of the plan of reorganization. It executed the declaration of trust on February 13, 1936, and has been serving as trustee since that time.

The receipt of the $34,000 by the trustee and the handing over of that sum to the owner of the property has only recently come to light. Neither the inventory nor the account filed by the trustee for the period commencing February 13, 1936, the date it executed the declaration of trust, and ending December 31, 1936, contained any mention whatsoever of the receipt or disbursement of the $34,000. It was not until October 27, 1937, that the receipt and disbursement of the $34,000 was called to the attention of the certificate holders and of the court. This occurred at the commencement of a hearing on an application by the trustee for judicial approval of an extension and modification of the mortgage held by the trustee. Counsel for the Mortgage Commission stated at said hearing that an assignment of rents had existed in connection with the property which had been canceled in January, 1935, at which time the owner had made a payment in consideration of the cancellation, and that the owner had operated the property for some time thereafter, collecting all the rents for itself without paying interest or taxes. Further inquiry revealed that the trustee had received $34,000 from the Mortgage Commission and had handed it over to the owner of the property. The present motion was then made to compel the trustee to account for the $34,000. The affidavit submitted by the trustee, in answer to the moving affidavit herein, attempts to excuse the failure to list the $34,000 in its inventory or account in the following language: " Brooklyn Trust Company as Trustee at the time of the preparation and filing of its inventory and account from February 13th to December 31st, 1936, was led to believe and still believes that the item of $34,000 did not constitute any part of the trust estate and for that reason the item was not included in the inventory and account." Regardless of whether this excuse is valid from a technical legal standpoint, good practice and a proper regard for the interests of the certificate holders, the beneficiaries of the trust, would seem to have required a frank and open disclosure by the trustee in its inventory and in its account of *all* the moneys received and disbursed by it. In the absence of such a disclosure, it is obvious that neither the certificate holders nor the court are properly apprised of the trustee's transactions and dealings, with the result that objections which might otherwise be filed to the trustee's account are overlooked through ignorance of the facts. The

trustee thus becomes the sole judge of its own conduct, escaping criticism and objections by the simple device of not including some of its dealings in its inventory or account.

No technical questions of procedure are involved here, for it was agreed that these proceedings were to be regarded as though the item had been included in the account, " objections have been filed, and the hearing is held here thereon."

The first question to be considered is whether the $34,000 belonged to the certificate holders as part of the trust estate or to the owner of the mortgaged property. In the court's opinion, the $34,000 was unconditionally paid over to the Superintendent of Insurance, as rehabilitator of the title company, on January 4, 1935, to be applied to the payment of arrears of interest and taxes, and the owner of the mortgaged premises retained no rights whatsoever in or to the $34,000 after said payment. In view of the voluminous nature of the testimony (about 800 pages) and the numerous exhibits, it would be impracticable and serve no useful purpose to discuss the evidence in detail. The court will accordingly content itself with a brief reference to the main reasons for its conclusion that the owner parted with all right, title and interest in the $34,000 on January 4, 1935.

The agreement dated January 4, 1935, between the Superintendent of Insurance and the owner of the mortgaged premises, provided that the latter " will pay forthwith on the basis herein set forth, all arrears of taxes, water rates and assessments, penalties accrued thereon, interest at the rate herein provided, accrued to the next previous interest due date." The promise to " pay forthwith * * * arrears of " taxes, water rates, assessments, penalties and interest is clearly unconditional. If the parties had intended that the $34,000 was to constitute a deposit, returnable to the owner in the event that the plan of reorganization was not promulgated or was not approved, it is reasonable to assume that the word " deposit " or a synonymous word would have been employed instead of the word " pay," or at least that the agreement would have contained a provision to the effect that the money was to be returned to the owner in certain contingencies. The absence of such a provision is significant. The receipt for the $34,000 " acknowledged the * * * payment of arrears of taxes and interest to December 31st, 1934," not the deposit of $34,000 to be applied to taxes and interest only in the event that a plan was promulgated and approved. That the $34,000 was not required to be held by the Superintendent of Insurance pending promulgation of the plan or the approval thereof is confirmed by the provision of the guarantors' letter of January

4, 1935, expressly authorizing the application of that portion of the $34,000 which exceeded the arrears of taxes and interest to December 31, 1934 (computed on the basis of the proposed plan), toward the payment of the first half of 1935 taxes, without any condition that the money could not be so used until the plan had been promulgated or approved. In fact the letter states that the taxes are to be paid *in no event later* than April 30, 1935. The agreement of January 4, 1935, between the Superintendent of Insurance and the owner of the property expressly contemplated that the assignment of rents then in the possession of the Superintendent would be either suspended or canceled and that the owner would be permitted to take possession of the property upon executing a new assignment of rents which was not to become effective except in the event of a subsequent default or failure to pay. In accordance with the agreement, the Superintendent did immediately turn over possession of the property and the right to collect rents therefrom to the owner. Although no formal document was executed, the assignment of rents held by the Superintendent was, in effect, released or suspended.

It is evident from a reading of the agreement of January 4, 1935, that the consideration for the suspension or release of the rent assignment held by the Superintendent was the outright and unconditional payment of the $34,000 to be applied on account of arrears and also on taxes for the first half of 1935. It is most unreasonable to construe the agreement in such a way that the Superintendent of Insurance would be giving up the assignment of rents held by him, on an apartment house covering an entire block front on Madison avenue and Eighty-seventh street — thereby permitting the owner to " milk " the property by collecting and pocketing the rents without paying taxes or interest — merely because of a deposit of $34,000 by the owner, *which would later have to be returned to the owner in the event that the proposed plan was not promulgated or approved.* Such a construction, doing violence, as it does, to common sense, should not be adopted unless the language of the agreement permits of no other interpretation. It is impossible to believe that the Superintendent of Insurance ever intended to enter into such a one-sided agreement with the owner, giving up the income of the property in return for a mere deposit which could not be retained unless a plan was promulgated, approved by the necessary number of certificate holders and thereafter approved by the court. In the court's opinion, the absence of any express provision characterizing the $34,000 as a deposit and of any provision for its return, as well as the use of affirmative language (a) in the agreement, (b) in the receipt for the

$34,000, and (c) in the guaranty, indicating a contrary intention, all compel the conclusion that the $34,000 was to be paid outright and unconditionally for the purpose of inducing the Superintendent of Insurance to permit the owner to collect the rents which would otherwise belong to the Superintendent under the rent assignment held by him. The recitals of the guaranty which accompanied the agreement of January 4, 1935, expressly state that the purpose of the $34,000 payment and of the guaranty was "to protect the Rehabilitator against any loss which may arise because of the suspension of the assignment of rents * * * with the consequent loss of the net rent to be derived from these premises by virtue of the Rehabilitator's thus going out of possession, and therefore to induce the Rehabilitator to suspend said assignment of rents." The agreement itself states that the purpose of the guaranty of the difference between the net income derived from the property during any quarter-year, and the $34,000, was to insure that the rehabilitator would be paid, in effect, the net income for the preceding three momths "so that no loss will be sustained because of the suspension of the assignment of rents which is provided for hereunder."

It is to be noted that during the four months ending April 30, 1935, the owner did in fact "milk" the property. It collected net rents aggregating $39,642, no part of which has ever been paid to the certificate holders or any representative of theirs. Concededly the taxes for the first half of 1935, amounting to $24,000, due not later than April 1, 1935, were not paid and interest was likewise not paid.

Although certain portions of the agreement of January 4, 1935, were obviously not to take effect unless and until the plan of reorganization was promulgated and approved, those provisions of the agreement which relate to the $34,000 and the suspension or release of the assignment of rents held by the Superintendent were manifestly intended to take effect forthwith and not to await promulgation and approval of the plan. It is to be borne in mind that the agreement itself definitely provides that it is in no way to be construed as a commitment of the Superintendent to the proposed plan of reorganization therein contained, and further, that the Superintendent expressly reserves the right to criticize, to indicate modifications, or to reject the plan.

Correspondence between the owner and the Superintendent of Insurance preceding the agreement of January fourth confirms the court's conclusion that the $34,000 was not a deposit, but an outright payment. The court is, however, of the opinion that no such confirmation is needed, for it is clear from the language of the

documents executed on January fourth that the $34,000 was unconditionally paid to the Superintendent, to be used by him at his pleasure for the payment of arrears of taxes, water rates, assessments and interest, and also for the payment of taxes for the first half of the year 1935. The correspondence prior to January 4, 1935, has been disregarded by the court in arriving at its conclusion that the $34,000 was paid by the owner, without reservations or conditions, in return for a release of the rent assignment.

The trustee contends that the Superintendent of Insurance and his successor, the Mortgage Commission, placed a practical construction on the agreement of January 4, 1935, that the $34,000 was not to be applied to the payment of interest and taxes unless and until the plan was approved. The chief basis for this claim is the failure of the Superintendent of Insurance and of the Mortgage Commission to use any part of the $34,000 for the payment of interest or taxes and the retention of the fund intact until it was turned over to the trustee. The trustee also relies upon the nature of the respective accounts in which the $34,000 was entered on the books of the Superintendent of Insurance and the Mortgage Commission respectively, and upon the fact that before delivering the check for the $34,000 for transfer to the trustee, the Mortgage Commission requested and received an authorization and a release from the owner and from the guarantors.

It is well settled that the doctrine of practical construction may be resorted to only for the purpose of interpreting ambiguous instruments. (*Brainard* v. *New York Central R. R. Co.*, 242 N. Y. 125, 133; *Hopwood Plays, Inc.*, v. *Kemper*, 263 id. 380, 384.) Assuming, however, that the agreement of January 4, 1935, pursuant to which the $34,000 was paid, is sufficiently ambiguous to permit application of the rule of practical construction, the court is nevertheless of the opinion that the evidence fails to establish that the payment of $34,000 had been construed by the Superintendent and by the Mortgage Commission as representing a mere deposit by the owner, still belonging to the latter, and returnable to it in the event that the plan was not promulgated and approved.

Despite repeated demands by the owner over a long period of time for the return of the $34,000, neither the Superintendent of Insurance nor the Mortgage Commission ever returned the money, or indicated any intention to do so, or admitted the validity of the owner's claim that it was entitled to get the $34,000 back.

It is impossible to reconcile the failure of the Superintendent and the Mortgage Commission to return the $34,000 to the owner in response to its demand with the trustee's claim that said authorities construed the payment of the $34,000 as a deposit returnable

to the owner in the event that the plan referred to in the agreement of January 4, 1935, was not promulgated or approved. The initial omission of the Superintendent to apply the $34,000 to the payment of arrears of interest and taxes was due, according to the evidence, to difficulties encountered in connection with the application of the funds to the payment of interest arrears at a reduced rate for a period during which certificate holders had already received payment at a higher rate. It was because of the " legal question " thus arising that the funds were not immediately devoted to the payment of arrears of interest. The fact that thereafter the $34,000 continued to remain unapplied is of no special significance in the light of the fact that it was not at all unusual for the Superintendent of Insurance during the period in question to defer payment of taxes and interest arrears notwithstanding his possession of funds available for that purpose. Whatever significance might nevertheless attach to the retention intact of the $34,000 is clearly overcome by the more persuasive circumstance that every demand of the owner for the return of the money met with no success.

The other bases for the claim of practical construction are equally unconvincing. The fact that the $34,000 was deposited to " Mortgage Agency Account " does not avail the trustee, for the funds customarily deposited in that account included moneys to which the owners of mortgaged premises retained no title and which the Superintendent had the right to apply to the payment of interest. Moneys deposited in connection with proposed plans of reorganization and which were subject to return by the Superintendent in certain contingencies were placed in another account and not in the mortgage agency account. Similar observations are applicable to the character of account in which the $34,000 was carried on the books of the Mortgage Commission. The fact that in the closing statement which it sent to the trustee the $34,000 was referred to under the heading, " Unapplied Funds — Mortgagor's Funds — Unapplied — Mortgage Agency," is also of no particular significance. " Mortgagor's Funds " is only one of the types of funds referred to in the heading of the account. The testimony established that the account embraced all funds which were not the proceeds of rent assignments and, therefore, included funds other than those to which the mortgagor retained title; also that deposits made by owners under reorganization plans, which were subject to return in certain contingencies were entered in a wholly different account. The fact that the Mortgage Commission insisted upon an authorization and release from the owner and from the guarantors before turning over the $34,000 for delivery to the trustee was due, as the evidence clearly indicates, to a desire on the part of the

Commission to be protected against the possibility that the owner and guarantors might have a claim to the funds, not to a definite determination or admission by the Commission that said claim was valid and that the funds did belong to the owner or to the guarantors. It is unnecessary to consider the question of practical construction in greater detail. The court is of the opinion that the evidence falls far short of establishing that either the Superintendent of Insurance or the Mortgage Commission recognized or treated the $34,000 as belonging to and returnable to the owner of the mortgaged premises.

There remains for consideration the trustee's claim that even if the owner had no right to the return of the $34,000 the trustee is nevertheless exonerated from liability for improperly returning that sum to the owner by reason of the fact that it acted in good faith and without negligence. The $34,000 was returned to the owner by Mr. Curtayne, assistant secretary of the trustee, in charge of the certificated trust department of the Brooklyn Trust Company. According to a statement which he had made to Mr. Henry Weiner, chief trial counsel for the Commission, Curtayne in paying the money over to the owner relied solely upon a letter dated May 29, 1936, from the Mortgage Commission to the trustee which accompanied the transfer of the $34,000 to the trustee. This letter states that the $34,000 " was deposited in connection with a proposed extension and modification plan and *at the time the deposit was made an assignment of rents was canceled,* although our records indicate that the title company subsequently received a new assignment of rents. *This money was deposited for application on the arrears existing against the premises recomputed in accordance with the plan.*" (Italics the court's.) It goes on to specify that the reason for the failure to apply the funds on account of the arrears was " uncertainty with respect to the terms of the plan and the fact that interest which was to have been recomputed under the plan had already been paid to certificate holders at a higher rate." It concludes with a statement that " this check is, of course, delivered to you and received by you subject to any claims which Twelve Hundred Madison Ave. Corporation and Louis and Morris Golde may have to said fund."

If Curtayne relied solely upon the contents of this letter as establishing that the $34,000 belonged to the owner of the premises and that the latter was entitled to the return thereof, the conclusion is inescapable that he was guilty of the grossest negligence. There is nothing in the letter to indicate a recognition or admission on the part of the Mortgage Commission that the $34,000 belonged to the

owner of the premises and could properly be returned to the latter. On the contrary, the letter contains statements which clearly point in the opposite direction. The letter states that at the time the money was paid to the Superintendent an assignment of rents was canceled. It declares that money was deposited for application on the arrears existing against the premises recomputed in accordance with the plan, without mention of any conditions entitling the owner to the return of the money. It does not state that the application of the $34,000 to the arrears was to await promulgation or approval of a plan. It attributes the failure to apply the fund immediately on account of arrears to the uncertainty regarding the terms of the plan and the complication arising in regard to the retroactive computation of the interest for the period during which the certificate holders had already been paid a higher rate. In referring to the claim asserted by the owner of the premises and by the guarantors, the letter omits any statement regarding the Mortgage Commission's views as to the propriety and validity of said claims. The check is turned over, not subject to the claims of the owner and the guarantors, but merely " subject to *any* claims " which they " *may* have." (Italics the court's.) There is nothing whatsoever in the Mortgage Commission's letter to indicate or suggest that the claim of the owner of the mortgaged premises was a valid and proper one. Curtayne's payment of the $34,000 to the owner, who was then in arrears as to taxes and interest in the enormous sum of $177,388.28, *solely* on the strength of said letter and without independent inquiry, would, therefore, constitute flagrant negligence.

It is, however, Curtayne's testimony that he relied on a number of additional documents, viz., (1) the closing statement of the Mortgage Commission, dated February 15, 1936, (2) two letters written by the *owner's* attorney to the Mortgage Commission demanding the return of the $34,000 on the theory that it was a mere deposit in connection with a reorganization which never materialized, and (3) a letter from the *owner's* attorney to Curtayne dated May 4, 1936, to the same general effect as the two previous letters. The reference in the closing statement received from the Mortgage Commission to the $34,000 under the heading of " Unapplied Funds — Mortgagor's Funds — Unapplied — Mortgage Agency," has already been shown to be inconclusive, to say the least. The statement called attention to an attached letter from the *owner's* attorney to the Commission, dated January 18, 1936, demanding the return of the $34,000. No mention of the nature of the Commission's answer, if any, to said letter is to be found in or attached to the closing statement. At best, therefore, the

closing statement of the Commission and the letter attached thereto left the proper disposition of the $34,000 in doubt. Particularly is this so when the closing statement and the attached letter are read in conjunction with the Commission's letter of May 29, 1936, previously referred to, which accompanied the transfer of the $34,000 check to the trustee. Despite the uncertainty and doubt surrounding the ownership of the $34,000, Curtayne made no effort whatsoever to ascertain the facts relating to the ownership of the money. He admittedly did not even go to the trouble of making a telephone call or writing a letter to the Commission or to anyone else. He made no effort to see the documents pursuant to which the $34,000 was originally paid over to the Superintendent of Insurance. *The $34,000 which the owner had been unable to obtain from the Superintendent of Insurance and thereafter from the Mortgage Commission, despite repeated demands, the trustee handed over without investigation, on the mere say-so of the owner, only five days after it had received the same from the Mortgage Commission.* This is hardly the care which beneficiaries have the right to expect from a trustee. The reckless nature of Curtayne's conduct is readily apparent from a reading of his testimony. A few excerpts will suffice:

" Q. What did you see at that time? A. I saw this statement [referring to closing statement of the Mortgage Commission]. * * * Q. What did you see about the $34,000? A. ' Unapplied Funds — Mortgagor's Funds — Unapplied — Mortgage Agency.' * * * Q. Did you write to the Mortgage Commission and ask them what was meant by that entry? A. No. Q. Did you call up anyone in the Mortgage Commission to ask what was meant by that entry? A. No. Q. When did you see it again after the end of April? A. I saw it just before I paid the money over. * * * Q. Did you at that time write to the Mortgage Commission and ask them anything about the $34,000? A. I did not. Q. Did you call anyone in the Mortgage Commission — did you have any of your subordinates or associates make any inquiry at the Mortgage Commission? A. I don't think so. Q. Don't you know? A. [No response by the witness.] Q. I am asking you whether you asked any of your associates or subordinates to make any such inquiry. A. No, I did not. Q. You did not ask counsel about the matter, did you? A. No. * * * Q. When you talked to Mr. Zieser, did you ask him whether he had received an answer to this letter [referring to Zieser's letter to the Mortgage Commission on behalf of the owner demanding the return of the $34,000, dated January 18, 1936, which was attached to the Mortgage Commission's closing statement]? A. No. Q. And you did not call up the Mortgage Commission or write to them to ask if they had answered

the letter? A. No. * * * Q. And neither you nor any of your subordinates or associates at your direction made any inquiry from the Mortgage Commission as to whether they had ever answered that letter? A. No. * * * Q. When Mr. Zieser started negotiating with you, did you ask him what this plan was that he had taken up with the Mortgage Commission? A. No. * * * Q. Did you ask him why the Mortgage Commission had not promulgated the plan as he stated in the letter of January 18, 1936, where he says ' My client desires the return of the $34,000 because no plan was promulgated on the basis of the deposit of the $34,000? ' A. No, I did not. Q. You asked him no question about that plan or the failure to promulgate it? A. No. Q. Or the basis for the deposit of the $34,000? A. No. * * * Q. Had you read any of the minutes of the hearings on the reorganization? A. I have not, no, sir. * * * Q. When you saw that statement in the letter of the Mortgage Commission of May 29th [the letter transmitting the $34,000 to the trustee] saying that the assignment of rents had been surrendered subsequently, did you ask anyone what happened in the interval between the surrender of that assignment of rents until the new assignment of rents? A. No."

The three letters written by the owner's attorney, upon which Curtayne claims to have partially relied, of course furnish no justification whatsoever for Curtayne's turning over the money to the owner. They were clearly self-serving declarations on the part of the owner. *Curtayne's readiness to give credence to these letters is particularly amazing in the light of the fact that Curtayne admitted he had refused to accept a new plan of reorganization proposed by the owner because he suspected the honesty of an individual prominently identified with the owner corporation. Portions of Curtayne's testimony on this subject follow:* " Q. What were the reasons assigned for rejecting that plan? A. We did not like the behavior of the owner. * * * Q. In what respects did they [the trustee's committee] state that they did not like the behavior of the owner? A. We found that the owner organization was not paying us all the money that should have been paid to us and we decided to eliminate them completely from the picture. * * * Q. So that the only reason that the plan was rejected by the Brooklyn Trust Company was that you were dissatisfied with the owner interest because you thought their agent was not remitting to you all the proceeds of the property? A. That is right. * * * Q. You thought it was Mr. Natanson who was interested back in June, 1936? A. I did not think he was interested alone, but I thought he had some substantial interest in the property. Q. And you thought that those interests ought to be eliminated? A. Yes. * * * Q. And what did your investigations show? A. The

investigations showed that certain bills were marked ' paid ' and were not paid. *Q. When did you first learn of that condition? A. The last few days in May, 1936.* \* \* \* Q. What was the approximate aggregate amount of these bills that were not paid but were stamped ' paid? ' A. I don't recall at this time, but it was a couple of thousand dollars. \* \* \* Q. You understood Mr. Natanson had a substantial interest both in the Douglas Management, Inc. [the agent] and the owner corporation? A. That is right. \* \* \* Q. But you did know — I want to repeat that — that there was a substantial community interest between the owner corporation and the Douglas Management, Inc.? A. That was my impression. *Q. And despite that, despite the discrepancies which you had discovered of several thousand dollars, in unpaid bills, you took the owner's version as to the circumstances under which the $34,000 was deposited without any further investigation than what you have related here, is that correct? A. I took that into consideration in connection with the version of the Mortgage Commission. Q. You took it with no other investigation than what you have previously testified to, which included the communications from the Mortgage Commission and the fact that they did not contradict the owner's statement and the fact that they had remitted the bulk of the funds two or three months prior to the $34,000, is that correct? A. That is correct."* (Italics the court's.)

The documents upon which Curtayne claims to have relied in returning the $34,000 to the owner of the mortgaged property clearly did not justify a determination on Curtayne's part that the $34,000 belonged to the owner. The very most that can be said is that they might have warranted the conclusion that doubt and uncertainty existed as to whether the trustee or the owner had the right to the $34,000. In such a situation ordinary prudence and care demanded that Curtayne (1) either make an investigation of the facts relating to the original payment of the $34,000 by the owner and such other facts as might throw light on the ownership of the funds before determining what disposition to make thereof, or else (2) hold on to the moneys pending a judicial determination of the rights of the parties. The turning over of the money to the owner without any investigation and without any judicial determination constituted a flagrant and indefensible violation of the trustee's obligation to exercise due care and to refrain from negligence. This is all the more so in view of the fact that the arrears of taxes and interest amounted at the time to more than $175,000. The trustee is accordingly accountable for the improper payment of the $34,000.

In order to permit the fullest possible light to be thrown on the entire situation, the court has permitted the introduction of con-

siderable evidence which is not strictly admissible. For example, many documents offered by counsel for the trustee were admitted into evidence despite the fact that counsel for the trustee conceded that neither the trustee nor Curtayne were even aware of the existence of these documents until long after the trustee had returned the $34,000 to the owner. In order that the appellate courts may have as complete a record as possible before them of all the facts considered material and relevant by respective counsel, the motions to strike out upon which decision has been reserved will be denied with appropriate exceptions. The court wishes to make clear, however, the fact that in arriving at the conclusion that the $34,000 no longer belonged to the owner after January 4, 1935, none of the correspondence antedating that date has been considered, the determination being predicated solely upon the documents executed on January 4, 1935. The motion to dismiss made by the trustee is denied, with exception, and the motion to compel the trustee to account for the $34,000 is granted. Settle order.